GORDON L. COMMONS, HELEN T. COMMONS AND LEO WEIN-
GARTEN, T/A BETTER MODERN HOMES CO., PLAINTIFFS-
APPELLANTS, v. WESTWOOD ZONING BOARD OF ADJUST-
MENT AND MAYOR AND COUNCIL OF THE BOROUGH OF
WESTWOOD, DEFENDANTS-RESPONDENTS.

Argued October 22, 1979—Decided January 18, 1980.

600

*Mr. Herbert F. Savoye, Jr.*, argued the cause for the appellants.

*Mr. Irving C. Evers* argued the cause for the respondents.

The opinion of the court was delivered by

SCHREIBER, J.

We are again called upon to examine the proceedings before and findings of a board of adjustment which denied a zoning variance for construction of a single-family residence on an undersized lot. See *N.J.S.A.* 40:55–39(c). Plaintiffs, Gordon L. Commons, Helen T. Commons and Leo Weingarten, filed a complaint to review the denial of the variance by the Borough of Westwood Zoning Board of Adjustment. The Superior Court, Law Division, and the Appellate Division affirmed the board's action. We granted plaintiffs' petition for certification. 79 *N.J.* 482 (1979).

The facts developed at the hearings before the Board of Adjustment were substantially undisputed. The property in question is a vacant lot, designated as Lot 20 in Block 208 on the tax map of the Borough of Westwood. Located in an established residential area consisting of one and two-family dwellings, this lot is the only undeveloped property in the neighborhood. Plaintiffs Gordon and Helen Commons are the present owners. They and their predecessors in title have owned this plot since 1927. Plaintiff Weingarten, a builder, contracted to purchase the property on the condition that he could construct a one-family residence on the lot.

A variance from the borough's zoning ordinance was necessary for two reasons. The land was located in a District B residential zone requiring a minimum frontage of 75 feet and a minimum area of 7500 square feet. The lot, however, has a frontage on Brickell Avenue of only 30 feet and a total area of 5190 square feet.

When adopted in 1933, the borough's zoning ordinance contained no minimum frontage or area provisions. However, a 1947 amendment required that one-family houses be located on lots with a frontage of at least 75 feet and an area of no less than 7500 square feet. At the time the amendment was adopted there were approximately 32 homes in the immediate area. Only seven satisfied the minimum frontage requirement. The nonconforming lots had frontages varying from 40 to 74 feet.

This situation has remained virtually unchanged, only two homes having been constructed thereafter, one in 1948 with a frontage of 70 feet and one in 1970 with a frontage of 113 feet.

Weingarten proposed to construct a single-family, one and one-half story "raised ranch" with four bedrooms, a living room, dining room, kitchen, two baths and a one-car garage. Weingarten had no architectural design of the proposed house, but submitted a plan for a larger home which he claimed could be scaled down. The proposed home would have an approximate width of 19 feet, 18 inches and a depth of 48 feet. It would be centered on the 30-foot lot so as to provide five-foot side yards, the minimum required by the zoning ordinance. The proposed setback would also conform with the zoning plan. Weingarten further explained that the proposed residence would be roughly 18 feet from the house belonging to Robert Dineen located on adjacent land to the north, and 48 feet from the two-family residence owned by David Butler on the property to the south. The Dineen property has a 50-foot frontage, and the Butler frontage measures 74.5 feet.

The proposed home would be offered for sale for about $55,000. That price compared favorably with the market values of other nearby homes which a local realtor, Thomas Reno, estimated at between $45,000 and $60,000. Reno testified that the proposed home would not impair the borough's zoning plan because the house would be new, its value would compare favorably with other homes, its setback from the street would be at least as great as others, and the distances between the adjoining houses on each side would be substantial.

In 1974, plaintiff Gordon Commons had offered to sell the lot to Dineen for $7,500. Negotiations terminated, however, after Dineen countered with a $1,600 proposal, the assessed value of the property. When Weingarten contracted to purchase the land, he sought, albeit unsuccessfully, to purchase from Butler a 10-foot strip, adjacent to the south side of the lot.

Many neighbors opposed the application for a variance. Butler testified that a house on a 30-foot lot would be aesthetically displeasing, would differ in appearance by having a garage in front rather then alongside the dwelling, and would impair property values in the neighborhood. Another property owner, whose home was across the street, expressed her concern about privacy, reasoning that the occupants of a four-bedroom residence on a small lot would cause a spillover effect in terms of noise and trespassing.

The board of adjustment denied the variance, finding "that the applicant failed to demonstrate any evidence to establish hardship" and "that the granting of the variance would substantially impair the intent and purpose of the Zone Plan and Zoning Ordinance of the Borough of Westwood." The trial court, after reviewing the testimony, affirmed because it felt that to permit the variance "would be detrimental to the entire area wherein the property in question is situated." The Appellate Division, holding that the board of adjustment had not acted arbitrarily, affirmed in a brief per curiam opinion.

The variance application was filed and heard when *N.J.S.A.* 40:55–39(c) was effective. That statute has been replaced with *N.J.S.A.* 40:55D–70(c) of the Municipal Land Use Law, *N.J.S.A.* 40:55D–1 *et seq.* Since these provisions are substantially the same and we are remanding this matter to the board of adjustment, we shall consider the issues in the light of the current statute.

## I.

*N.J.S.A.* 40:55D–70(c) provides that a board of adjustment shall have power to grant a variance where by reason of the narrowness of the land or other extraordinary and exceptional situation of the property, the strict application of a zoning ordinance would result in exceptional and undue hardship upon

the developer of the property.[1] In addition, the statute's negative criteria must be satisfied, that is that the variance can be granted "without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance." As in *Chirichello v. Monmouth Beach Zoning Bd. of Adjustment*, 78 *N.J.* 544 (1978), where the proposed residence conformed to the use requirement of the zoning ordinance but had insufficient frontage and area, we are called upon to consider and analyze the "undue hardship" concept and the negative criteria.

"Undue hardship" involves the underlying notion that no effective use can be made of the property in the event the variance is denied. Use of the property may of course be subject to reasonable restraint. As Justice Pashman observed in *Taxpayers Association of Weymouth Tp., Inc. v. Weymouth Tp.*, 80 *N.J.* 6, 20 (1976), *cert.* den. 430 *U.S.* 977, 97 *S.Ct.* 1672, 52 *L.Ed.*2d 373 (1977), "[z]oning is inherently an exercise of the State's police power" and the property owner's use of the land is subject to regulation "which will promote the public health, safety, morals and general welfare . . . ." *N.J.S.A.* 40:55D–2(a). Put another way an "owner is not entitled to have his property zoned for its most profitable use." *Bow & Arrow Manor v. West Orange*, 63 *N.J.* 335, 350 (1973). See *Shell Oil Co. v. Shrewsbury Zoning Bd. of Adjustment*, 64 *N.J.* 334 (1974). However, when the regulation renders the property unusable for

---

[1]The statute refers to situations in which a denial would "result in peculiar and exceptional practical difficulties to, or exceptional and undue hardship upon the developer of such property." *N.J.S.A.* 40:55D–70(c). In *Chirichello v. Monmouth Beach Zoning Bd. of Adjustment*, 78 *N.J.* 544, 552 (1978), we referred to the language as indicating "two different standards, difficulties or hardship," and noted that "the two in large measure are overlapping and complementary. Clearly, peculiar and exceptional practical difficulties may well bear upon the exceptional and undue hardship visited upon the owner of the property." [citations omitted]

any purpose, the analysis calls for further inquiries which may lead to a conclusion that the property owner would suffer an undue hardship.

It is appropriate to consider first the origin of the existing situation. If the property owner or his predecessors in title created the nonconforming condition, then the hardship may be deemed to be self-imposed. To measure this type of impact it is necessary to know when the zoning ordinance limitations were adopted and the status of the property with respect to those limitations at that time. Thus, if the lot had contained a 75-foot frontage and despite the existence of that requirement, the owner sold a 40-foot strip of the land, he or his successors in title would have little cause to complain. Likewise no undue hardship is suffered by an owner of a lot with a 35-foot frontage who acquired an adjoining 40-foot strip so that the lot complied with the ordinance and then sold a part of the land. These examples serve to illustrate the nature of a self-inflicted hardship which would not satisfy the statutory criteria.

Related to a determination of undue hardship are the efforts which the property owner has made to bring the property into compliance with the ordinance's specifications. Attempts to acquire additional land would be significant if it is feasible to purchase property from the adjoining property owners. Endeavors to sell the property to the adjoining landowners, the negotiations between and among the parties, and the reasonableness of the prices demanded and offered are also relevant considerations. See *Gougeon v. Stone Harbor Bd. of Adjustment*, 52 *N.J.* 212, 224 (1968), where it was held that if an owner of land refused to sell at a "fair and reasonable" price he would not be considered to be suffering an "undue hardship." If on the other hand the owner is willing to sell at a "fair and reasonable" price and the adjoining property owners refuse to make a reasonable offer, then "undue hardship" would exist.

When an undue hardship is found to exist, the board of adjustment must be satisfied that the negative criteria are

satisfied before granting a variance. Thus the grant of the variance must not substantially impinge upon the public good and the intent and purpose of the zone plan and ordinance. As we observed in *Chirichello*, "the variance may be granted only if the spirit of the ordinance and the general welfare are observed." 78 *N.J.* at 552. In this respect attention must be directed to the manner in and extent to which the variance will impact upon the character of the area. We have frequently observed that the applicant carries the burden of establishing the negative criteria by a fair preponderance of the evidence, but that "[t]he less of an impact, the more likely the restriction is not that vital to valid public interests." *Chirichello v. Monmouth Zoning Bd. of Adjustment*, 78 *N.J.* at 561. See *Fobe Associates v. Demarest*, 74 *N.J.* 519, 547 (1977).

There lurks in the background of cases of this type the possibility that denial of a variance will zone the property into inutility so that "an exercise of eminent domain [will be] . . . called for and compensation must be paid." *Harrington Glen, Inc. v. Leonia Bd. of Adjustment*, 52 *N.J.* 22, 33 (1968). When that occurs all the taxpayers in the municipality share the economic burden of achieving the intent and purpose of the zoning scheme. Compared to this result is the denial of a variance conditioned upon the sale of the property at a fair market value to the adjoining property owners. They will perhaps receive the more direct benefit of the land remaining undeveloped and it may therefore be fairer for them to bear the cost. In this respect we made the following pertinent comments in *Chirichello:*

> It would certainly be consonant with the interest of all parties to deny a variance conditioned on the purchase of the land by adjoining property owners at a fair price. The immediate benefit to the adjoining property owners of maintenance of the zoning scheme and aesthetic enjoyment of surrounding vacant land adjacent to their homes is self-evident. The owner of the odd lot would suffer no monetary damage having received the fair value of the land. Of course, if the owner refused to sell, then he would have no cause for complaint. Or if the adjoining owners would not agree to purchase, then

perhaps the variance should be granted, less weight being given to their position particularly when the land in question will have been rendered useless. In either event the use of a conditional variance, the condition bearing an overall reasonable relationship to the purposes of the zoning ordinance, may lead to a satisfactory solution. See *Harrington Glen, Inc. v. Leonia Bd. of Adj., supra; Houdaille Const. Materials, Inc. v. Tewksbury Tp. Bd. of Adj.,* 92 *N.J.Super.* 293 (App.Div.1966); *Cohen v. Fair Lawn,* 85 *N.J.Super.* 234, 237–238 (App.Div.1964).

Hearings before the board of adjustment serve as the focal point for resolution of conflicting interests between public restraints on the use of private property and the owner's right to utilize his land as he wishes. A third interest which frequently makes its appearance is represented by other property owners in the immediate vicinity whose major objective is the more limited self-interest of taking whatever position they believe will enhance the value of their property or coincide with their personal preferences. The board of adjustment must settle these disputes by engaging in a "discretionary weighing," a function inherent in the variance process. [78 *N.J.* at 555–556]

We have referred to the fair market value and the fair and reasonable price of the property with respect to considerations of offers to purchase and sell the property as well as the possibility of conditioning the variance. We believe that the preferred method to determine value is on the assumption that a variance had been granted so that a home could be constructed on the lot. See *Gougeon v. Stone Harbor Bd. of Adjustment,* 52 *N.J.* at 224, and *Chirichello v. Monmouth Beach Zoning Bd. of Adjustment,* 78 *N.J.* at 562 (Pashman, J., concurring). It is possible that other methods of valuation may be feasible. However, the parties have not briefed or argued the issue and accordingly we do not foreclose such possibilities.

## II.

Here, the board of adjustment concluded that "the applicant failed to demonstrate *any* evidence to establish hardship on the part of the applicant." (emphasis supplied) The record does not support that conclusion. Until the 1947 amendment to the zoning ordinance the plaintiffs or their predecessors

in title could have constructed a one-family house on the lot. Ownership commenced in 1927 when the Borough of Westwood had no zoning ordinance. Furthermore, an attempt, albeit unsuccessful, had been made to acquire an additional ten-foot strip from Mr. Butler, owner of the property bordering to the south. A 40-foot frontage would have at least brought the property into conformity with one home in the neighborhood and within close proximity of the size of the lots of two other houses. In addition there had been discussions concerning the possible sale of the property to a neighbor, there being a substantial divergence in the offering and asking prices. Lastly, one could reasonably conclude that, if a variance were not granted, the land would be zoned into inutility. In view of all the above, it cannot be said that there was *not any* evidence to establish hardship.

Passing to the negative criteria, the board of adjustment made only the conclusive statement that the variance would substantially impair the intent and purpose of the zone plan and ordinance. The manner in which the variance would cause that effect is not explained. The board found that the lot was the only 30-foot parcel in the block, that the applicant builder had never constructed a house on a 30-foot lot, and that the proposed house would be 19 feet in width. How these facts relate to the zone plan is not made clear. The proposed use, side yards and setback meet the requirements of the ordinance. The proposed sales price of the home would be within the range of the value of the houses in the neighborhood. The total acreage of the land, exceeding 5,000 square feet, is comparable to 17 other properties in the neighborhood.

Perhaps the proposed house would be smaller in size than others. But in and of itself that would not justify a denial of a variance. Size of the house does not violate any of the traditional zoning purposes of light, air and open space which are reflected in the ordinance. We have recognized that minimum lot size "may be closely related to the goals of public health and safety" but that minimum floor area requirements

"are not *per se* related to public health, safety or morals." *Home Builders League of South Jersey, Inc. v. Berlin Tp.*, 81 *N.J.* 127, 139, 142 (1979).

It is possible that the board of adjustment was concerned with the appearance of the house and its relationship to the neighborhood from an aesthetic and economic viewpoint. These are proper zoning purposes, for the appearance of a house may be related to the character of the district. *N.J.S.A.* 40:55D–62(a). In *Home Builders League of South Jersey, Inc.* 81 *N.J.* at 145, we recognized that conserving the value of the surrounding properties and aesthetic considerations are appropriate desiderata of zoning. Thus, if the size and layout of the proposed house would have adversely affected the character of the neighborhood, both with respect to a "desirable visual environment," *N.J.S.A.* 40:55D–2(i), and the value of the neighborhood properties, a board may justly conclude that a variance should not be granted.

The board's resolution does not address these problems. They are brought into sharp focus when an articulation of findings and reasoning must be made. We have frequently advised boards of adjustment to make findings predicated upon factual support in the record and directed to the issues involved. We refer again to Justice Francis's statements in *Harrington Glen, Inc.*, 52 *N.J.* at 28:

> Denial of a variance on a summary finding couched in the conclusionary language of the statute is not adequate. There must be a statement of the specific findings of fact on which the Board reached the conclusion that the statutory criteria for a variance were not satisfied. Unless such findings are recited, a reviewing court cannot determine fairly whether the Board acted properly and within the limits of its authority in refusing a variance. [citations omitted]

In this connection boards should be mindful that they may receive assistance from other municipal employees. The board would not have been amiss here in calling the municipal building inspector to testify to construction requirements. The board or its counsel may also have addressed

inquiries with respect to the size and appearance of the other homes, and the aesthetic and economic impact upon those homeowners. We do not mean to imply that the burden of proof is not upon the applicant. It is, but in performing its function as a governmental body, the board may take some action which may be of assistance to it. The difficulty in this case also rests with the applicants. They did not submit a plan of the proposed house, demonstrate compliance with the municipality's building code, and adequately describe the appearance and type of the structure. It is essential in a case of this type that the proponent submit a detailed plan of the proposed house. Under all these circumstances we believe fairness calls for a remand to the board of adjustment so that the record may be supplemented, the matter reconsidered, and adequate findings made.

Reversed and remanded to the Borough of Westwood Zoning Board of Adjustment.

*For reversal and remandment* —Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*For affirmance* —None.